UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>-vs-<br><br>THOMAS R. VALLEY. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **SENTENCING BRIEF<br>AND MEMORANDUM**<br><br><br>Case No. 3:11-CR-00133-001 |

**SENTENCING BRIEF AND MEMORANDUM**

The following is a brief and memorandum in support of Defendant's request for a downward variance. It focuses exclusively on the flawed methodology used to create USSG § 2G2.2, and why this provides reason for the Court to vary downward from the applicable sentencing guideline. It is intended to supplement the sentencing memorandum submitted by attorney Gregory Dutch, which addresses the application of the specific 18 U.S.C. § 3553(a) factors to this case.[1]

**I.      Introduction.**

The final sentencing guideline range calculated in the presentence report, while the result of five separate groups of offenses, is largely the product of the receipt of child pornography offenses calculated using § 2G2.2. *See* PSR ¶ 65 (calculating the adjusted offense level for Group One—the receipt of child pornography offenses—as 42); ¶ 94

---

[1] This document attempts to summarize the voluminous research done by Assistant Federal Defender Troy Stabenow on the history and development of USSG § 2G2.2 and other guidelines relevant to child pornography offenses. Although I have cited sparingly to his work, this submission is based entirely on his research. Of particular use, should the Court require more information on the legislative history of § 2G2.2, is his position paper, Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines (Jan. 2009) (hereinafter "Deconstructing the Myth"), available at http://www.fd.org/docs/Select-Topics---sentencing/child-porn-july-revision.pdf.

(noting the offense levels for the other four groups to be between 34 and 36). A sentencing court may deviate from a guideline on policy grounds, including when it finds that a guideline does not accurately reflect the sentencing considerations contained within 18 U.S.C. § 3553(a) because it is the product of direct congressional action rather than the Sentencing Commission acting in its designated capacity. The driving guideline in this case, § 2G2.2, is an example of such a guideline. As shown below, it is the product of direct congressional action rather than the calculated and empirically driven work of the Sentencing Commission. Accordingly, this Court should join the majority of other district courts across the country in disregarding it.

## II. The Court has the Authority to Grant a Downward Variance Based Solely on Policy Disagreements With § 2G2.2.

When imposing sentence, the first step a district court must take is to properly calculate the applicable guideline. *See Gall v. U.S.*, 552 U.S. 38, 49 (2007). However, the applicable guideline range is but one of the statutory factors that a court should consider when determining sentence. *See Kimbrough v. U.S.*, 552 U.S. 85, 90 (2007); *U.S. v. Carter*, 530 F.3d 565, 578 (7th Cir. 2008). Importantly, a sentencing court cannot afford sentencing guidelines a presumption of reasonableness. *See Gall*, 552 U.S. at 50. Indeed, a sentencing court is free to vary from a guideline based on policy disagreements with the guideline itself. *See Rita v. U.S.* 551 U.S. 338, 351 (2007); *U.S. v. Halliday,* 672 F.3d 462, 474 (7th Cir. 2012) (district courts are "at liberty to reject *any* [g]uideline on policy grounds. . . ."). Such a variance, particularly when the guideline in question is not the product of the Sentencing Commission's characteristic institutional role, is not "suspect" or subject to "closer review." *Spears v. U. S.*, 555 U.S. 261, 264 (2009); *see also Kimbrough,* 552 U.S. at 109-10; *Rita,* 551 U.S. at 348, 349-50.

### III. The Evolution § 2G2.2: A Congressional Creation.

The Sentencing Commission is charged with "formulat[ing] and constantly refin[ing] national sentencing standards" in accordance with the institutional strength that it possesses and individual district courts lack: the ability to "base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough*, 552 U.S. at 108-09 (internal citations omitted). However, when a guideline is the product of direct congressional intervention it reflects the will of the legislature, not the empirical expertise of the Sentencing Commission. In this case, § 2G2.2 is not the product of the Sentencing Commission's characteristic institutional role; rather it is the product of decades of direct congressional actions that have often been at odds with the recommendations of the Sentencing Commission. The result is a guideline that conflicts with the overarching parsimony requirement of § 3553(a).

The base offense level applicable to receipt of child pornography has been increased three times. Each time has been the result of either direct congressional action aimed at the guideline, or a response by the Sentencing Commission to comport with congressionally created mandatory minimum sentences. *See* Stabenow, *Deconstructing the Myth,* Appendix A. Specifically, in 1991 and again in 1996, the base offense level was directly increased through legislative action. *See Treasury, Postal Service, Executive Office of the President, and Independent Agencies Appropriations, Fiscal Year 1992*, Pub. L. 102-141, § 632; *Sex Crimes against Children Prevention Act of 1995*, Pub. L. 104-71. Then, in 2004, the Sentencing Commission further increased the base offense level for receipt offenses, but only in an effort to conform the guideline to newly enacted

3

mandatory minimum sentences for receipt of child pornography that was created by Congress in 2003.  *See Protect Act*, §103 Pub. L. 108-21; Amendment 664, USSG App. C.  The result has been an increase in the base offense level for § 2G2.2 offenses from 13 to 22, based not on the Sentencing Commissions' analysis of empirical data, but the political whims of Congress.

Not only has the § 2G2.2 base offense level been the subject of congressional inflation, so too has the myriad of applicable offense-level enhancements.  For example, the variable enhancement for number of images, pursuant to subsection (b)(5), was a direct congressional amendment to the guideline.  *See Protect Act*, Pub. L. 108-21, § 401.  Similarly, the 2-level enhancement for use of a computer, pursuant to subsection (b)(6), and the variable increase for non-pecuniary distribution, pursuant to subsection (b)(3), were the results of legislative directives from Congress to the Sentencing Commission. *See Sex Crimes Against Children Prevention Act of 1995*, Pub. L. 104-71 § 3; *Protection of Children from Sexual Predators Act of 1998*, Pub L. 105-314, § 206.  These changes provide for between six and twelve offense-level enhancements in any given case that are not based on empirical study and recommendation by the Sentencing Commission, but instead on direct congressional action.

The result of these congressional changes has been a dramatic increase in the sentences for those convicted for possessing, receiving, or distributing child pornography. The mean sentence for such offenders rose 443% between 1997 and 2007, from 20.6 months to 91.3 months of confinement.  *See* Stabenow, *Deconstructing the Myth*, p.2. Simply establishing that Congress mandated significant increases to § 2G2.2 does not, in and of itself, provide the Court with reason to disagree with those changes.  However,

4

when the manner in which these changes were made, and the reactions of both the Sentencing Commission and district courts around the country are considered, the policy considerations supporting a downward variance become clear.

### IV. Congressional Tinkering Created a Guideline that Fails To Accurately Reflect the Sentencing Considerations of § 3553(a).

Many of the congressional actions increasing § 2G2.2 have a common theme; they were last-minute earmarks to otherwise popular bills, and were passed with little or no debate. Perhaps the best example is the Freeney Amendment, an addition to the 2003 Protect Act that not only decreased the availability of many downward departures for child pornography offenses, but directly amended § 2G2.2 to add the offense-level enhancement for number of images. *See* Skye Phillips, *Protect Downward Departures: Congress and the Executive's Intrusion Into Judicial Independence*, 12 J.L. & Pol'y 947, 967-83 (2004). This Amendment was added with no notice to the Sentencing Commission, and after only twenty minutes of debate. *See id*. at 983. There is no indication that the direct amendments to § 2G2.2 were ever discussed. *See id*. However, similar procedures were used in 1991, when Senate Amendment 780—which increased the base offense level for § 2G2.2 offenses—was added to the Treasury-Postal Service Appropriations Bill of 1991 in committee and passed with no debate in the Senate, and very limited discussion in the House of Representatives. *See* Stabenow, *Deconstructing the Myth*, p. 6-7 (*citing Treasury, Postal Service, Executive Office of the President, and Independent Agencies Appropriations, Fiscal Year 1992*, 137 Cong. Rec. S10356-01, S10363; 137 Cong. Rec. H6736-02).

Notably, the Sentencing Commission has voiced objection to nearly all of the

5

aforementioned changes to § 2G2.2.  Beginning in 1991, the Chair of the Sentencing Commission cautioned against increasing the base offense level for § 2G2.2 offenses, noting it would "negate the Commission's carefully structured efforts to treat similar conduct similarly and to provide proportionality among different grades of seriousness of these offenses."  *See* Stabenow, *Deconstructing the Myth*, p. 8.  In 1996, the Commission bristled at the blanket 2-level enhancement for use of a computer, noting that "a person's culpability depends on *how* they use a computer," and concluding that "Congress and the Commission may wish to develop a more finely-tuned system of apportioning punishment in cases involving the use of computers."  *See* U.S. Sent'g Comm'n, *Report to Congress, Sex Offenses Against Children* (1996) at 29, 30.[2]  Finally, in response to the mandated changes contained in the 2003 Protect Act, the Sentencing Commission noted, "[t]he frequent mandatory minimum legislation and specific directives to the Commission to amend the guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress."  *See* U.S. Sent'g Comm'n, *Fifteen years of Guideline Sentencing:  Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing* (Nov. 2004) at *73*.[3]

In considering the Commission's response to these congressional actions, it bears repeating that "Congress established the Commission to formulate and constantly refine

---

[2] Available at: http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Sex_Offense_Topics/199606_RtC_Sex_Crimes_Against_Children/199606_RtC_SCAC.PDF

[3] Available at: http://www.ussc.gov/Research_and_Statistics/Research_Projects/Miscellaneous/15_Year_Study/15_year_study_full.pdf

national sentencing standards" and, as such, it "fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *See Kimbrough*, 552 US. At 108 (2007) (citing *Rita,* 551 U.S. at 347-50). The fact the Congress directly modified § 2G2.2 as outlined above without utilizing the institutional strengths of the Sentencing Commission, and often over the Sentencing Commission's objection, only supports the claim that sentencing courts should vary on policy grounds from any sentencing range calculated using § 2G2.2. *See id.* at 109-110 (providing that a district court can vary from the crack-cocaine guidelines even in a "mine-run" case because those guidelines "do not exemplify the Commission's exercise of its characteristic institutional role.").

District court judges across the country appear to agree. In 2011, 65.6% of offenders sentenced under § 2G2.2 received below-guideline sentences, with 48% of those coming without an accompanying government motion. *See* U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics,* tbl. 28.[4] To contrast, the overall rate of offenders that were sentenced below their guideline range without a government motion in 2011 was only 17.8%. *Id.*, tbl. N. The fact that district courts across the country are sentencing offenders below the § 2G2.2 guideline range nearly two-thirds of the time confirms that Congress' politically motivated actions created a guideline that fails to adequately reflect the § 3553(a) considerations, even in the mine-run case.

### V. The Guideline Calculation in this Case Exemplifies the Problems with § 2G2.2.

---

[4] Available at:
http://www.ussc.gov/Research_and_Statistics/Annual_Reports_and_Sourcebooks/2011/sbtoc11.htm

In this case it is undisputed that Defendant engaged in a variety of reprehensible behaviors.  His sentencing guideline is the result of five distinctly calculated and grouped offenses.  *See* PSR ¶ 94.  Of those five groups, only one relates to the receipt of child pornography, while the other four groups relate to the production of child pornography.  *See Id.* ¶¶ 65, 72, 79, 86.  Production of child pornography is generally considered a more serious offense than the receipt of child pornography.  *Compare* 18 U.S.C. § 2251(e) (setting a 15 year mandatory minimum and a 30 year mandatory maximum for production of child pornography) *with* 18 U.S.C. § 2252(b)(1) (setting a 5 year mandatory minimum and a 20 year mandatory maximum for the receipt of child pornography).  Nevertheless, the guideline here for the receipt of child pornography offenses, calculated using § 2G2.2, is six to eight offense-levels higher than any of the guideline calculations for the various production counts.

This illustrates the problem with § 2G2.2.  The offense conduct involved in Group One is very similar to that comprising the other offense groups— it involves Defendant persuading teenage girls to send him naked photographs using the Internet.  Yet, in large part because of the numerous offense level enhancements contained in § 2G2.2, the resulting offense level for the receipt of child pornography offenses is significantly higher than that for any of the production offenses.  This exemplifies the failure of § 2G2.2 to meaningfully distinguish between various levels of culpability.

### VI.   CONCLUSION.

Defendant requests that the Court grant a downward variance in this case based on the fact that the driving guideline in this case, § 2G2.2, does not reflect the empirically driven approach of the Sentencing Commission and, thus, is not a reasoned starting point

8

for the application of § 3553(a) factors, even in the mine-run case.  While it may reflect the political desires of various legislatures, a congressional "directive that the Commission specify a particular [g]uidelines range is not a mandate that sentencing courts stay within it."  *U.S. v. Michael,* 576 F.3d 323, 328 (6th Cir. 2009).  As such, the Court should afford it little weight, and grant Defendant's request for a downward variance in this case.

Dated: August 6, 2013

                                              s/ Nathan Otis
Atty. Nathan Otis
State Bar No. 1079832
Nicholson & Gansner, S.C.
14 W Mifflin St Suite 103
Phone: (608) 237-6854
Fax: (608) 819-8273

CC: AUSA Elizabeth Altman