IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
MADISON DIVISION

THOMAS VALLEY )
    Petitioner )
 )
v. )  Case No. 11-CR-133-BBC
 )
 )  MOTION TO REDUCE SENTENCE PURSUANT
United States of America )  TO 18 U.S.C. § 3582(c)(1)(A)(i)
    Respondent )
 )
 )

    COMES NOW, THOMAS VALLEY (Mr. Valley) pro-se, to submit his request to this honorable court to reduce his sentence to time served pursuant to 18 U.S.C. §3582(c)(1)(A)(i) for extraordinary and compelling reasons. Mr. Valley is thirty six years old, and suffers from Acute Sinusitis; Essential hypertension, and asthma. These serious underlying health concerns, combined with the growing coronavirus pandemic, provide extraordinary and compelling basis for sentence reduction pursuant to the First Step Act. Mr. Valley requests that this court reduce his sentence to time served. Mr. Valley is amenable to a term of home incarceration to demonstrate to the court that he can readjust to society and the terms and conditions of supervised relief. All these measures will enable him to protect himself and others from this disease caused by the novel coronavirus (COVID-19) by sheltering in place at his residence where he can social distance, have access to appropriate healthcare, and live with others that take the dangers of this pandemic seriously.

## PROCEDURAL POSTURE

    Mr. Valley entered a conditional plea of guilty on April 23, 2013, to a two-count information charging him with receiving visual depictions of minors engaged in sexually explicit conduct in

1

violation of 18 U.S.C. §2252(a)(2). Each of these two counts carried a potential incarceration of 5-20 years. Mr. Valley was sentenced on August 14, 2013, to a term of 40 (forty) years (the maximum on each count run consecutively). Mr. Valley has been incarcerated since June of 2011.

## LEGAL ARGUMENT

### I. Mr. Valley's Motion to Reduce Sentence should be heard by this court.

On December 21, 2018, the First Step Act of 2018 (FSA) was enacted into law. Among several criminal justice reforms, the FSA makes fundamental changes to how federal compassionate release functions. See First Step Act of 2018, §603(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018). Notably, Congress amended 18 U.S.C. §3582(c)(1)(A) by permitting the sentencing court to entertain motions for compassionate release filed by defendants. (Id.) Specifically, the amended statute instructs that the Court may modify a term of imprisonment once it has been imposed if "the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such request to the warden of the defendant's facilty, whichever is earlier... may reduce the term of imprisonment... after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction[.] 18 U.S.C. §3582(c)(1)(A)(i).

In this instance, Mr. Valley has requested twice Compassionate Release to the warden. The first denial was earlier this year. A generic boilerplate response from the Unit Management team was returned to Mr. Valley denying his request.

Furthermore, in light to the second unreasonable and negligent outbreak at USP Marion in November 2020, Mr. Valley filed a subsequent request to the Warden to no avail.

Mr. Valley was informed that the administrative remedy requirement was waived by the seventh circuit for exhaustion. Regardless, this motion in alternative should be considered an emergency and should not require exhaustion as waiting for all levels of denials would prove futile in this dangerous situation. See McCarthy v. Madigan, 503, US 140, 117 LEd2d 291, 112 SCt. 1091 (1992).

II. In light of COVID-19, Mr. Valley's medical conditions constitute Extraordinary and Compelling Reasons Warranting Reduction in Sentencing.

   A. COVID-19 Pandemic is a Unprecedented Health Crisis Which Presents a Grave and Unique risk to Prisoners.

There have been an unreasonable amount of deaths to inmates in Bureau of Prison's (BOP) custody from COVID-19. USP Marion has had two deaths just at this facility -- one of which lived in Mr. Valley's housing unit -- when he actually contracted the virus. COVID-19 has been tearing through BOP facilities like a wildfire. It's been reported that incarcerated individuals are being infected at a rate of more than 6.5 times higher than the United States population at large. See BOP-Reported Positive Tests for COVID-19 Nationwide (5/2020) https://federaldefendersny.org/

Needless to say, these facilities -- like mine, face signifigant challenges in adequately addressing the spread of a highly infectous pathogens such as COVID-19. See www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm. These challenges include "crowed dormitories, shared lavatories, limited medical and isolation resources, daily entry and exit of staff members and visitors, continual introduction of newly

incarcerated or detained persons, and transport of incarcerated or detained persons in multi-person vehicles for court-related, medical or other security reasons." <u>See</u> www.cdc.gov/caronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

This facility is no different -- if not worst. Staff do not take preventative measures seriously to reduce the chances of introduction of the virus, or containing it once it is spread. Almost all staff regularly do not wear masks in inmate housing areas. Inmates are not provided with appropriate disinfectant that has the potency to fight against this virus. Since the beginning of this pandemic, no hand sanitizer has been available for purchase or issued to inmates.

Furthermore, regular cleaning of high touch surfaces is not completed. Areas such as phones, keyboards for computers, tables, and showers, are used routinely without any cleaning.

When the facility does have an outbreak -- there have been two so far -- staff do not make any intentional efforts to reduce or eliminate the spread. Staff continue to walk in the housing unit without masks, isolation gowns, eye protection, and do not change gloves when passing things between positive or negative tested inmates. The facility administration and correctional staff do not take the safety and welfare of the inmates seriously.

The only response this facility provides is extremely long lock downs of inmates in their cells (in 3-man cells where social distancing is not possible), restrictions from taking showers, and lack of communication with family. The facility makes no attempts to identify, reduce and eliminate the spread, and staff do not follow preventative or isolation procedures.

4

As an example, the death of 30-year-old Andrea Circle Bear on April 28, 2020 - four weeks after giving birth to her daughter while on a ventilator - is emblematic of the tragedy unfolding on the BOP's watch. See Nicholas Bogel-Burroughs and Vanessa Swales, Prisoner With Coronavirus Dies After Giving Birth While on Ventilator, NY Times (April 2020) htts://nyti.ms/3duihji. Ms. Circle Bear was serving a two year sentence for a non-violent drug offense. (Id.). The BOP knew that Ms. Circle Bear had a pre-existing medical condition that placed her at risk of illness should she contract COVID-19 (Id.). They also knew that Ms. Circle Bear was in the eighth month of a high risk pregnancy. (Id.). None the less, she was placed in prison. Three days later, Ms. Circle Bear developed a fever, dry cough and other symptoms consistant with onset of COVID-19. (Id.). The next day, her baby was born by cesarean section. (Id.). Ms. Circle Bear died three weeks later (Id.). Federal judged around the country have used unusually blunt terms to describe the governments behavior: "an outrage.,"[1] "deliberate indifferencde,"[2] Many other courts have used similar language to describe the BOP's conduct in these situations.

Similar to the conduct at this facility, those adjectives accurately describe the leadership, prevention and reaction to these factors at this facility. A modification on the basis the BOP cannot or otherwise will not protect Mr. Valley - alone warrants a reduction in sentence in the case at bar - on this basis alone.

### B. Even if, there are a limited amount of reported cases when this request is considered, does not mean USP Marion is safe.

As previously mentioned, Mr. Valley is in a facility that has experienced not one, but two major outbreaks of COVID-19. In the first

---

1) Wilson v. Williams, ----F. Supp.3d----WL 1940992, at*8 (N.D. Ohio, 4/22/20)
2) U.S. v. Separta, ----F.Supp.3d----, 2020 WL 1910481, at *1 (S.D.N.Y 4/20/20).

outbreak occured in July 2020 in a "single-housing unit." This is the exact housing unit that Mr. Valley was housed in. He tested positive for COVID-19 on July 27, 2020 - roughly ten days after the initial reported outbreak. His positive test was a result of "conversion" - BOP's failure to prevent spread: a product of their lack of diligence to follow isolation procedures, COVID action plans, and staff not taking inmate welfare seriously. Mr. Valley suffered several critical symptoms, some of which are still with him today.

At the time of this outbreak and even just before, there were other inmates that were preventatively submitting their campassionate release to their district courts. The facilities boilerplate response included alleged action plans that they falsely makes avowals to follow. The Marion USP facility boasted that there were no cases at USP Marion. However, that was only the case because the facility was not testing inmates. They weren't doing their job. Therefore, Mr. Valley should not have to wait for eventual outbreaks to be protected from this virus.

Courts have recognized, the presence of even a single confirmed case - combined with the lack of testing - make it "reasonably likely" that COVID-19 has spread among the population at the prison. See United Statess v. Gonzales, No. 17-cr-00062 WL 2511427 at *4 (D. Conn. 5/2020). see also Martinez-Brooks v. Easter, WL 2405350 at *2 (D. Conn 5/2020).

Mr. Valley reminds this court that he and his fellow inmates cannot "social distance" from eachother, and that the BOP has been regularly transferring inmates from other facilities. Medical staff have candidly admitted that positive cases are detected in intake from other facilities. The problem will never stop.

The first outbreak in July 2020 resulted in over 150 inmate

6

cases, ten staff cases, and two inmate deaths. When inmate positive cases were discovered in the housing unit, they were moved to a "quarantine unit." During this time, very little to no medical visits were provided to inmates, and after two weeks, without any re-testing, inmates were discharged and released back into general population. Despite Mr. Valley complaining of residual effects of the virus, medical did not address nor document these concerns, but instead were templatesque in their medical notes.

In November 2020, as staff continued to bring in infected inmates from other facilities and not wearing masks around vulnerable inmates, another violent wave hit USP Marion -- still present today. One of the worst units affected was L Unit -- again the unit Mr. Valley lives in, with over 85 positive cases in this unit alone. The facility suffered 350+ cases and NPR identified USP Marion as the third highest in the Nation for COVID infections in prison. Even if the virus is "purged" this time around -- as it supposedly was in July 2020, there is no reason to believe it won't came back again. It is reasonable to conclude it will come back worst and as history as demonstrated, USP Marion cannot protect inmates from this virus.

C. The Eighth Amendment

Mr. Valley encourages this honorable court to consider the eighth amendment of the United States Constitution when considering his request. This amendment protects prisoners against cruel and unusual punishment during confinement. As explained before, it is not reasonable to require Mr. Valley to wait to be infected with this deadly virus before seeking and obtaining relief.

To require Mr. Valley to remain in a deadly housing situation is deplorable. Mr. Valley pled guilty to a crime to which he received a sentence (although high) was not a life sentence. With the presence

of this virus, the high vulnerability of community spread, and staff negligence and indifference -- it has become a possible death sentence -- for anyone; especially Mr. Valley who has relevant risk factors.

Mr. Valley deserves the protection under this constitution directive and requests this court to consider the implications of Mr. Valley's environment, standards of care, and health concerns.

### D. Mr. Valley runs High Risk of Illness or Death if He Contracts COVID Again

Mr. Valley has a current diagnosis of Sinusitis -- likely a product of his Asthma -- both of which the facility refuses to address. As this court is well aware, Asthma is identified as a High risk factor for those who contract COVID-19. This is a serious health concern that cannot be understated.

Mr. Valley also has a current diagnosis for Hypertension -- also a high risk factor identified by the CDC. It makes Mr. Valley very vulnerable and the virus very deadly.

Mr. Valley still suffers the effects of his eaerlier contraction of the virus in July 2020. It is not unreasonable to conclude Mr. Valley could have permanent injury or fatality if he contracts it again.

To make a gamble and force Mr. Valley to take his chances and rely on some lucky odds of survival would be kafkaesque. Mr. Valley urges this court to grant his motion for relief in light of this serious medical conditions.

### E. Courts have Recognized COVID-19 Pandemic as an Extraordinary and Compelling Reason to Release vulnerable Inmates.

Courts have recognized the devastating impact of COVID-19 on vulnerable inmates with Mr. Valley's conditions.

For example, in <u>United States v. Kataev,</u> No. 16-cr-763. ECF No. 778 (S.D.N.Y. 4/2020) (an inmate was released suffering from "sinusitis" and a wife who was unable to care for their ten-year-old daughter). Mr. Valley also has this health condition and is aware of situations regarding his daughter (M.V, 9) that may require his parental attention.

In <u>United States v. McPherson</u>, No. 94-cr-5708 ECF No. 209 (W.D. Wash. 4/2020) (releasing a defendant with an astronomical sentence and risk factors of COVID-19, noting that no "civilized society" could permit continued incarceration under these circumstances.

In <u>United States v. Sawicz</u>, No. 08-cr-287 No. 66 (E.D.N.Y) (a child pornography offender based on "[t]he outbreak at FCI Danbury, combined with the fact defendant was at risk for suffering severe complications if he contracts the virus because of his <u>hypertension.</u>

The risk of serious illness or death from the unprecedented global pandemic, together with all the other relevant factors in this case, presents an extraordinary and compelling basis for sentence reduction.

### III. Mr. Valley's Time Served Accomplishes Goals of Sentencing Pursuant to §3553(a) Factors

When extraordinary and compelling reasons are establishes, the Court must consider relevant sentencing factors in 18 U.S.C. §3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. §3582(c)(1)(A)(i). In turn, Section 3553(a) directs courts to "impose a sentence, sufficient, but <u>not greater than necessary</u>, to comply with the purposes of sentencing, which are:

   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a)(2).

    Mr. Valley has ben incarcerated since 2011, nine years. In the time Mr. Valley has served, he has already met many of the §3553(a) factors. Under all the circumstances in this case, Mr. Valley urges the court to conclude that the time that Mr. Valley has already served a sentence sufficient to satisfy the purposes of sentencing.

    By way of example, with regard to factor (A) -- Mr. Valley has served a sentence more than reasonable for the offense of "receiving visual depictions of minors engaged in sexually explicit conduct (18 U.S.C. §2252(a)(2). The offense range is anywhere from 5-20 years per count, and both counts could run concurrently. It is not unusual for these sentences to run concurrent. This was the first time felony charge for Mr. Valley, and therefore, the minimum sentence on each should have been necessary, even if two minimum sentences were run consecutive (totaling ten years).

    The sentence of five-ten years reflects the seriousness of the offence. Mr. Valley has lost valuable events and milestones of his children's lives and relationships with others. It shocks the conscience based on the gravity of the offense, henceforth -- promotes respect for the law, and provides punishment of the offense.

    With regard to factor (b) -- Mr. Valley wants nothing to do with this type of conduct again and plans to abstain from any material that would put him in positions like that in the future. No part of this process -- including the standards of confinement he has received in prison does he want to have to experience again.

With regard to (C) -- there is no reason to believe that Mr. Valley would be a danger to the public. Mr. Valley has become older, wiser, and has much time to reflect on his poor decissions that led him to a place where he is today. The factors that were announced to the court to enhance sentencing are no longer present in Mr. Valley's life. Mr. Valley therefore is no risk to community safety.

Lastly, with regard to factor (D) -- as demonstrated before, there is no possible way this facility can meet these requirements. There is no education, vocational training, and medical care is insufficient to both treat and prevent this virus. All programming has stopped.

When this wasn't a factor, Mr. Valley did participate in programs and maintained a job at UNICOR. Mr. Valley reported to work and completed all tasks assigned -- gaining real-world job training.

The overriding factor is §3553 (a) was not present at the time of sentencing -- that is the COVID-19 pandemic and the serious risk it presents. Although the seriousness of Mr. Valley's offense led the court to impose its original sentence, the sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening disease.

Therefore, Mr. Valley urges the court to reduce his sentence to time served for all the reasons of §3553 as well as other reasons in this motion.

IVII. Mr. Valley has a place to go and future plan

Should this court grant this motion to reduce sentence, Mr. Valley can reside at a safe and reasonable residence: 339 S. Main St. Cottage Grove, WI 53527. This is Mr. Valley's aunt and uncle's residence. Mr. Valley would abide by all terms and conditions set

forth in his supervised release plan and any other restrictions as ordered by the court. Mr. Valley is amenable to a GPS ankle monitor to gain the trust of the probation department and the court.

After such a time that the pandemic subsides, Mr. Valley would enter treatment classes, pursue medical treatment for the effects that his initial COVID-19 diagnosis has caused, and seek employment. Mr. Valley plans on repairing the relationship with his minor children and being present in his young daughters life who does desire reconciliation.

## V. CONCLUSION

For all the above reasons, Mr. Valley's Motion to Reduce Sentence should be granted.

Respectfully submitted,

*Thomas R. Valley*
Thomas R. Valley

Date: 12-15-20