IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

THOMAS R. VALLEY )
    Petitioner )
)
vs. )
)
UNITED STATES OF AMERICA )   Case No. 11-cr-00133-bbc
    Respondent )
)
)
_____ )

MOTION FOR RECONSIDERATION
Rule 59 (e)
and
DEFENDANT REPLY

A. INTRODUCTION

1. Defendant ("Mr. Valley") filed a motion under 18 U.S.C. §3582 (c)(1)(a) for compassionate release and resentencing. This motion was filed on 12/16/20, received by the court on 12/21/20 according to the letter received 1/15/21 by the court. (EXHIBIT 1)

2. In the same cover, 12/16/21, Mr. Valley informed the Court Clerk that the motion filed was the only copy and requested a copy and confirmation of filing. No response was received.

3. After not receiving any communication from the court, Mr. Valley filed a pro-se letter on January 4, 2021 inquiring to the status of the filing of the original motion and requesting a copy of the initial motion. On 1/15/21, the Court replied stating the briefing was complete and a ruling was pending before Judge Crabb (Exhibit 1).

4. Mr. Valley received a copy of the Court's denial on January 20, 2021 by a prison case manager, E. Murphy.

5. On 1/21/21, Mr. Valley received the Government's response to Mr. Valley's

1

motion on 1/21/21. Correction Systems Officer N. King signed and dated the envelope to confirm this fact. (EXHIBIT 2)

6. Because Mr. Valley received the government's response fifteen (15) days after the their filing, and after the Court's ruling, Mr. Valley was prejudiced and unable to respond to the Government's claims. This comprises prejudicial error and therefore, the Court should vacate the opinion on 1/19/21 (ECF. Doc. 128), and consider the reply by Mr. Valley.

B. ARGUMENT

1. There is cause for the Motion to Reconsider

Mr. Valley recognizes that a Motion for Reconsideration is not a mechanism that allows a party to revisit strategic decissions that prove to be improvidant, to make arguments that could and should have been made prior to briefing, to express mere disagreement with a decission of the Court, or to reprise or "rehash" arguments that were rejected. Goplin v. WeConnect, Inc. 893 F.3d 488 (7th Cir. 2018).

However, Motions for Reconsideration can serve as a valuable function, under appropriate circumstances, to ensure judicial accuracy. Seymour v. Hug, 413 F. Supp.2d 910, 934 (N.D.111.2005). Motions for Reconsideration under rule 59(e) serves as a limited function. It is to be based on error. Light Speed Media Corp. v. Smith, 830 F.3d 500, 05-06 (7th Cir. 2016). Because there was structural error and Mr. Valley was prejudiced by not receiving the government response until after the Court ruling, there is good cause for reconsideration.

Mr. Valley requests the Court to Grant the Motion for Reconsideration, Vacate the opinion (ECF. Doc. 128), and accept the Reply for the Motion For Compassionate Release and Resentencing.

The motion is timely, within 28 days of the Court's ruling. Any other

time constraints should be given flexibility due to the unusual and extraordinary restrictions due to the COVID-19 outbreak at USP Marion which affected Mr. Valley's ability to research legal issues. (EXHIBIT 3)

2. Reply to Government Response

A. Exhaustion Requirements are met.

The Government agrees that the exhaustion requirements for this pleading of compassionate release and resentencing are met and is ripe for review. Mr. Valley has met the statutory and administrative exhaustion requirements required by law.

B. Mr. Valley <u>does</u> have medical conditions that make him more susceptible and a higher risk to the contraction of COVID-19.

As an initial matter, the Government attempts to compel this Court to ignore or otherwise be suspicious of any claims the defendant advances due to the observations and opinion of an evaluator that took place many years ago. Indeed, the Government says, "anything [Mr. Valley] claims must be viewed with some skepticism." (Doc. 123 @ 8). For the Government to persuade the Court to be incredulous of Mr. Valley's concerns and statements is simply inappropriate and undermines the Order by Judge Crabb on 10/21/20 that promised Mr. Valley "full consideration" of his motion. (ECF. Doc 119).

Moving forward, Mr. Valley maintains that asthma (with astmatic bronchitis) and hypertension are indeed listed as right risk factors in COVID-19 that are identified by CDC and Courts.

Unfortunately, the Bureau of Prisons ("BOP") medical staff have failed to properly diagnose Mr. Valley with asthma. Mr. Valley told the health services staff that he had a history of asthma and had been diagnosed. Because of BOP's failure to properly diagnose Mr. Valley; it is not reflected in his medical history. That does not mean it's true.

Dr. Yu, M.D. of Physicians Plus in East Town, Madison, WI, affirmatively

3

diagnosed Mr. Valley with asthma (with asthmatic brochitis). Mr. Valley has been unable to obtain these medical records for the Court due to the extraordinary and unusual restrictions of COVID-19. In the interests of justice, Mr. Valley encourages the Court to issue a subpoena to this provider to verify the diagnoses to confirm the condition.

In United States v. Witherspoon, no. 16-cr-30041, US Dist. Lexis 92965 (7th Cir.) the Court shares information from the CDC: "People with moderate to severe asthma may be at higher risk of getting very sick from COVID-19. COVID-19 can affect your respitory tract (nose, throat, and lungs) cause an asthma attack and possibly lead to pnemonia and acute respitory disease." See also, United States v. Fettis, no. 17-cr-30003, 2020 US Dist. Lexis 98874.

Asthma is undoubtedly a high risk factor and concern for those who are vulnerable to catching COVID-19, or have caught it in the past (both factors presented to Mr. Valley). Mr. Valley still maintains symptoms and affects of this such as large coughing fits, etc. Mr. Valley has been unsuccessful in getting medical to respond. Mr. Valley spoke with Nurse S. May in July 2020 who promised him a breathing test - which has not happened. Follow-up emails have been sent as well as in-person contact.

Mr. Valley is confused as to why the Government suggests that high blood pressure (Hypertension) is not a relavent risk factor. The diagnosis is confirmed and undisputed.

Courts have time and time again ruled that hypertension is a reason to grant compassionate release. United States v. Berry no. 123947, 2020 US Dist. Lexis 123947 (7th Cir.). Multiple Courts around the country have written opinions that include this condition is a high risk factor. See United States v. Ford, 2020 US. Dist. Lexis 160935, at Footnote: 4 (citing multiple cases where hypertension is a risk factor for "extraordinary and

compelling reasons for compassionate release.")

Therefore, the Government's assertion that asthma and hypertension are not high risk factors and do not present "extraordinary and compelling reasons to warrant such a reduction" or "consistent with applicable policy statements" is misplaced. The medical conditions, current side affects, lack of response from BOP medical, and future consequences of a second contraction of the virus warrant a sentence reduction and compassionate release.

C. The Bureau of Prisons cannot protect Mr. Valley from the virus.

The government does not appear to address this argument and therefore waives their argument and concedes to the defendant's issue. See e.g. Maul v. Constan, 928 F.2d 784, 85-86 (7th Cir. 1991); see also rationale of United States v. Caceres-Olla, 738 F.3d 1051, 1054 n.1 (9th Cir. 2013).

The Government compels the Court to deny Mr. Valley's request for compassionate release because "the defendant does not indicate any medical care is needed or provide any information showing he would get better care in the community." (Id.) at 9, ECF Doc. 123). Mr. Valley's opening brief well illustrates the present and recurring dangers of remaining in prison during the pandemic. In fact, CNN reported on February 15, 2021 that there are seven strands of COVID-19 on "News Room". The situation is only getting more dangerous.

Mr. Valley is housed in 3-man units, where social distancing is not possible. As recent as November 2020, COVID-19 tore through the USP Marion facility and infected inmates in every housing unit: 450+ cases. In fact, on November 30, 2020, NPR world news listed Marion USP as the third highest in the Nation with COVID-19 cases.

As the Government rightly states, Mr. Valley did contract COVID-19 in July of 2020. (EXHIBIT 4); (Id.) @ 9. If the BOP was able to properly

5

protect Mr. Valley from the virus, he would not have caught it. Additionally, the BOP Medical staff provided boilerplate medical feedback on his charts/records -- which raises a great concern that individualistic notes are not being applied to each patient. In fact, Mr. Valley has information that nearly all patients (inmates) in the quarantine units received the same clinical notes and observations. Therefore, the medical notes have very little value with regard to treatment and recovery.

It is troubling that the Government would compel the Court to deny Mr. Valley's request for compassionate release because he does not currently have the virus. The conditions in prison are not safe and are a fast breeding ground for conversion. History has recently shown that. Mr. Valley rightly, fears for his life, and should not be subject to a dangerous and deadly environment. These are not "general concerns" but real ones. Inmates around the country have died from COVID-19 and have long lasting symptoms.

The Government takes the position that the Bureau of Prisons has taken appropriate measures to protect the defendant's health. However, they do not provide any proof of that. The historic outcome is inopposite. The Bureau of Prisons has a flow chart and action plan with regard to the proper prevention of COVID-19, such as wearing of masks. Staff regularily do not wear masks (which is how the disease spread to multiple units).

Additionally, once the virus was introduced, the BOP did not follow their infectious disease protocols for isolating positive inmates from negative inmates, isolation procedures, and ongoing symptom checks of affected inmates. The conditions were deplorable. See the well documented observations of Dylan Hernandez of the negligence of the faciliy's management of the virus (EXHIBIT 5). There is no doubt the facility would manage the virus carelessly and negligently in the future. To subject Mr. Valley to this imminent danger in the future is cruel and dangerous.

6

### D. Even if there are no cases at USP Marion currently, it does not mitigate the need for compassionate release.

COVID-19 is still rampant accross the nation. It is is no way under control. According to U.S. Today, Illinois and the surrounding areas have been identified as heavily saturated in COVID-19 cases. It is not getting any better.

Additionally, although the vaccine is available to staff members, many staff members are refusing to take the vaccine. Additionally, they do not wear masks or practice social distancing. The Government does not dispute any of these negligent practices and therefore concedes Mr. Valley's statements from the opening motion.

In United States v. Foster, no. 14-cr-324, the court noted the "unprecedented" and circumstances facing "our prison system" with COVID-19 is an extraordinary and compelling basis for release; indeed "[n]o rationale is more compelling or extraordinary." Courts have time and time again noted that "[i]n light of the expectation that the COVID-19 pandemic continue to grow and spread over the next several weeks, the Court conclud[ed] [] the risks faced by the defendant will be minimized by [the inmate's] immediate release home." United States v. Colvin, 2020 WL 1613943 (D.Conn. April 2020). In Rodriguez, 2020 WL 1627331, the Court found that COVID-19 constitutes extraordinary and compelling reasons associated with risk factors noting that prisons are "tinderboxes for infectous disease."

Courts have additionally recognized that just because a facility fails to report cases at a facility, that does not mean there are no cases. For example, in United States v. Asaro, 2020 WL 1899221, at *3 (E.D.N.Y. 4/20), where there were no cases reported at the facility, the report was "absent more information about how much testing the BOP was conducting, it is possible that undetected cases are present in the facility" and emphasizing that "[t]he virus is spreading" in the State where the prison is located.

7

Further, Courts have routinely granted requests for compassionate release during the COVID-19 pandemic even for inmates at facilities that have seen no cases of the virus. United States v. Washington, no. 2:01-cr-258, (E.D. Pa. 5/14/20). This took place in United States v. Ktkinson, no. 2:19-cr-55-jcm (CWH), 2020 WL 1904585, **2-4 (D. Nev. 4/2020). Like wise in United States v. Amarrah, 2020 WL 2220008, an inmate was released that had no reported cases at the facility.

Courts have even concluded that "prison conditions mean incarcerated individuals, as well as society as a whole, are safe when more defendants are released. United States v. Burrill, no. 17-cr-00491-RS-1, 2020 WL 1846788, at *4 (N.D. Cal., 4/10/2020). If Mr. Valley was released, he would be more protected, living in a location where his family takes precautions seriously, professional and responsive medical care would be available, and would not be a potential factor in spreading the virus if contracted again; not to mention the consequences.

The risk of re-infection is divided in the medical community. However, it has occured. Judge Myerscough in the seventh circuit opined that the "risk of reinfection is not merely theoretical." United States v. Common, 2020 US Dist. Lexis 108555, at Lexis 9 &10. In this instance, thirteen US sailors aboard the USS Theodore Roosevelt recovered from Caronavirus, endured a rigorous recovery criteria, exceeding CDC guidelines, tested negative, but still caught the disease a second time.

It is also of professional medical opinions that when reinfected, it is not associated with less severe symptoms. See www.publichealth.columbia.edu/public-health-now/news/risk-caronavirus-reinfection-remains-after-recovery.

Therefore, it is very reasonable that Mr. Valley have concerns about the BOP's ability to protect him, the potential consequences associated with

reinfection and the liklihood of the disease returning to the facility.

For those reasons incorproated, the Court should grant this Motion for Compassionate release.

### E. Mr. Valley's Time Served Accomplishes the Goals of Sentencing Pursuant to §3553(a) Factors.

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in 18 U.S.C. §3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. §3582(c)(1)(A)(i). In turn, Section 3553(a) directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In holding that the United States Sentencing Guidelines are advisory, rather than binding, the United States Supreme Court noted that the sentencing court "has 'greater familiarity with the individual case and the individual defendant before them than the Commission or the appeals court'" Kimbrough v. United States, 552 U.S. 85, 109, 128 S.Ct. 558, 574 (2007) (quoting Rita v. United States, 551 U.S. 338, 357-358, 127 S.Ct. 2456, 2469 (2007).

The Supreme Court in this instance identified seven factors that are used to determine the propriety of the sentence. In this instance however, for the purposes of this motion, the four above are addressed.

### 1. Reflection the Seriousness of the Offense and Providing Just Punishment for the Offense.

Mr. Valley respectfully submits to this Court that the sentencing guidelines is disproportionate to the offense. Numerous Federal Courts have recently noted that, while child pornography is unquestionably

9

a serious offense, the sentences suggested by the Federal Sentencing Guidelines were disproportionate. See United States v. Riley, 655 F.Supp.2d 12985, 1304 (S.D.Fla 2009) ("numerous district courts have imposed sentences far below the Guideline ranges for offenses involving possession and transportation of child pornography") (collecting cases). For example, in United States v. Baird, 580 F.Supp.2d 889 (D.Neb. 2008), the federal court imposed a sentence of 24 months where defendant downloaded over 800 images of child pornography, but the defendant had no criminal history. Also in United States v. Kelly, 865 F.Supp.2d 1202, 1211 (D.N.M.2012) (defendant received and dowloaded 580 images of child pornography; "[Defendant]'s advisory guideline was 87 - 108 months, which was far greater than necessary to punish and deter his conduct and protect the public. This is largely due to flaws in the U.S.S.G. §2G2.2, which was not drafted pursuant to the Sentencing Commission's usual expertise, and all to frequently generates unjustly excessive terms of incarceration").

In United States v. Stark, no. 10-cr-270, 2011 WL 555437, at *7 (D.Neb 2/8/11) (defendant downloaded over 100 images files, and had multiple hard drives containing over 2000 images, 5000 videos and 650,000 images of child erotica; "[T]he child pornography Guidelines are driven by Congressional directive and are not grounded in any scientific, statistical or emperical method... Although downloading child pornography is hardly a harmless activity, it is not the equivalent of direct physical abuse or sexual molestation of children, or production of pornography involving children. The Court finds that the range of imprisonment recommended under the Guidelines may be appropriate for a sexual predator, but are not a reliable appraisal of a fair sentence in this case").

There is no doubt that the Mr. Valley understands the seriousness of his offense: both the one(s) he pled guilty to, and the context of the

10

dismissed conduct. Mr. Valley does not seek reprieve for his actions. In fact, the truth that Mr. Valley pled guilty to the conduct shows that Mr. Valley was interested in accepting reponsibility for his conduct and in return to be able to serve a reasonable sentence which would allow him to return home safe to his family and be apart of his two children's lives.

In United States v. RV, 157 F.Supp.3d 207 (E.D.N.Y. 2016), Judge Weinstein noted that "[i]n departing downward, district judges nationwide have spoken out against the harsh Guideline sentences for child pornography offenders." (Id.) at 262. The RV Court noted that sentences for possession of child pornography have ranged from a few days to two years. Here, Mr. Valley received twenty times that amount.

However, one of the critical lessons of the RV Court was that each case must be considered on its own merits (rather than labels) and further, that conduct falls across a broad spectrum. While what Mr. Valley did was not appropriate, and predatory, it pales in difference to more shameful and physical behavior.

Mr. Valley got caught up in behavior that was not natural to his nature. Mr. Valley has reflected on this behavior on a regular basis and feels very bad for the minor girls that were impacted by his actions. They did not deserve it. This is behavior that Mr. Valley would never be involved in again.

The time that Mr. Valley has been away from his family and children has been a significant punishment. Mr. Valley realizes the importance of protecting our nations vulnerable population: children. Mr. Valley had no right to make these young women objects of lust and understands this conduct will never be acceptable.

Mr. Valley submits to this court that the time he has spent in prison is more than adequate to reflect the seriousness of the offense and promote

11

respect for the law, and asks the Court to resentence him to time served.

## 2. Afford adequate deterrence to Criminal Conduct

In subsection 3553(a)(2), Congress addressed the "need for the sentence imposed" from both a general deterrence standpoint, as well as "specific deterrence" standpoints, focusing on Mr. Valley personally.

From a general deterrence standpoint, a ten year sentence accomplishes this purpose. In <u>United States v. Baird</u>, 580 F.Supp.2d 889 (D.Neb. 2008), the district court sentenced an individual to two years for possession of child pornography. That Court found that a two-year sentence satisfied the concerns of Section 3553(a)(2):

> The Court find that a sentence of incarceration shorter than the sentence recommended under the guidelines reflects the seriousness of the offense and provides just punishment. The mere fact of Baird's prosecution deters others from engaging in this sort of conduct, and a sentence of incarceration will act as a further deterrent to others contemplating such activity. The value of any longer sentence is a deterrent, over and above these other factors, would be marginal.

(<u>Id.</u>) at 895. The same is true here. Ten years is a long period of time. It should well encourage those who, like Mr. Valley engaged these minors to send naked pictures, and the conduct in context.

From a specific deterrence standpoint, the arrest and prosecution is what taught Mr. Valley the lesson and provided his deterrence. A long prison sentence (coupled with the fears of COVID-19 consequences) will have only a marginal impact (if any) with respect fo such deterrences). Mr. Valley is not in denial of his conduct, and realizes the wrongfullness of it.

Mr. Valley does not have the advantage of looking at the sentencing transcript. But the Court tried to rationalize about feeling "sorry for [Mr. Valley's] problems..." and whether to keep Mr. Valley "out or give [him] a short term." The Court even opined that it would be "wonderful if there was some kind of mental institution that was capable of dealing with

12

Mr. Valley." (ECF. Doc 123 @ 5; R. 105 pp. 21-22, 25).

The Court did state the the Guidelines (as previously noted) exceeded the statutory maximum, but in this case, it is simply not necessary. This sentence does not provide Mr. Valley with any ability to rehabilitate himself or demonstrate he can be a productive member of society.

There are specialists out there that can deal with Mr. Valley's problems and tools that the U.S. Probation office can use to monitor Mr. Valley's activities, physically, online and otherwise.

Deterrence is accomplished, Mr. Valley does not want to go through this process again.

### 3. Protect the Public from Further Crimes of the Defendant:

One of the biggest points the government made was "even if the defendant's medical conditions constituted an extraordinary and compelling circumstance in light of COVID-19, the defendant <u>is a danger to the community</u>, and as such, <u>cannot be released</u>. (ECF 123 @ 10). Additionally the Government describes the Defendant's character as "conniving, manipulative and self-absorbed." (<u>Id.</u>) at 10. Mr. Valley does not disagree. The behavior was deviant, selfish and there is no excuse. However, this behavior was now almost <u>ten (10) years ago.</u> Mr. Valley has since grown up, become more mature, and has reflected on the seriousness of his actions.

What is missed by the Government is that the Court must also consider "the most up-to-date picture" of the defendant's history and characteristics which "sheds light on the liklihood that [the defendant] will engage in future criminal conduct." <u>Pepper v. United States</u>, 562 U.S. 476, 482 (2011).

Mr. Valley does not have a history of causing problems, and has worked toward bettering himself in prison. Mr. Valley has a complete different mindset than he did ten years ago, and therefore is not a danger in any way to the community.

### 4. Providing Defendant with Needed Educational or Vocational Training, Medical Care, Correctional Services.

As mentioned in the opening motion, there is no educational, vocational or treatment available at USP Marion during the pandemic. Therefore, the factors in this regard cannot be accomplished by the BOP.

When the services were available, Mr. Valley participated in many different programs. Mr. Valley accomplished the Education achievement of obtaining his GED - the highest sought out goal in BOP education. This accomplishment will further his ability to obtain employment and establish himself as a self-sustaining resident in the community.

Mr. Valley participated in Adult Continuing Education classes: Business 101; Screenwriting; Blue Print Reading. Mr. Valley enrolled in Stratford Career Institute in a correspondence Paralegal Program. In Recreation, Mr. Valley completed Crochet 1 and 2; and Drawing 1.

Mr. Valley made good use of his time and was productive. This further shows an example of his changed ways, learning new hobbies, and employment skills which will make him more successful in the community.

### F. Mr. Valley has a Home Plan (Release Plan)

Mr. Valley has a Home Plan where he can isolate. Mr. Valley has an address that he can establish himself: 339 S. Main Street.
Cottage Grove, WI 53527

Mr. Valley will reside with responsible adults who can ensure his transition to the community where he can continue to get treatment for his prior addictions and distortions; employment; and work toward beccomming a productive member of society.

Mr. Valley is amenable to a period of home confinement as part of the transition into the community as well as any monitoring measures the Court or U.S. probation desires as he builds credibility and trust.

Of major importance, Mr. Valley's children, M.J., 9 and R.V, 12, desire to re-establish their relationship with their father.

14

### G. Considerations of Sentencing under First Step Act.

Mr. Valley understands the First Step Act, making this pleading possible, (P.L. 115-391) was signed into law by the President on December 21, 2018. The Act deals with a lot of different things that impact inmates such as re-entry, programming, good-time credit, etc.

Of importance, it contains a sentencing reform provision (Title IV), which makes changes to mandatory minimum penalties and to the safety valve provision (a provision that allows courts to sentence a defendant without regard to the mandatory minimum.

Before the Act, a second or subsequent count of conviction under Section 924(c) triggered a higher mandatory minimum penalty, as well as mandatory "stacking" of sentences for each count of conviction.

Mr. Valley asks for consideration in at the very least, not running the terms of imprisonment consecutive.

### H. Summary of Resentencing

Mr. Valley requests this Court to grant his Compassionate release based on the following: A) The health concerns associated with his diagnoses; B) The fact the Bureau of Prisons cannot protect him from the Virus; C) The State of the virus and spread around America is getting worse; D) The BOP has a poor management plan of identifying, isolating, treating and eliminating the virus once the prison is affected; E) Factors under §3553(a) with regard to his progress.

The request is for no more than ten years total: both counts at five years, consecutive; or both counts at ten years, concurrent. Mr. Valley well has received just punishment for his crime and has changed his life. A sentence that reflects this timeframe will accomplish the sentencing goals of the United States.

I. Conclusion

For the foregoing reasons, in this Motion, Mr. Valley requests this Honorable Court to grant Mr. Valley's Motion for Compassionate Release and Resentencing consistent with the briefing.

Respectfully Submitted,

_____
Thomas Valley, Pro-Se

Date: 2-16-21