IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DOC NO
REC'D/FILED

2021 MAY 10  AM 11: 34

PETER OPPENEER
CLERK US DIST COURT
WD OF WI

THOMAS R. VALLEY )
         Petitioner, )
                          )
                          )
     v.                   )        Case No. 11-cr-00133-bbc
                          )
UNITED STATES OF AMERICA )
         Respondent, )
                          )
                          )
_____)


PETITIONER'S REPLY TO GOVERNMENT RESPOSE FOR
COMPASSIONATE RELEASE AND SENTENCING REDUCTION
UNDER 18 U.S.C. § 3582(c)(1)(A)(i)


COMES NOW, THOMAS R. VALLEY (Mr. Valley), pro-se, replying to the
United States Attorney's Office (Government) response in opposition
of his initial motion. (Doc 122). The Government essentially argues
there is no extraordinary and compelling reasons existent in Mr.
Valley's motion. Furthermore, they exhort the Court to deny Mr.
Valley's request(s) even if the Court concludes he meets the extra-
ordinary and compelling circumstances because he presents a danger
to society. Therefore, Mr. Valley responds to the Goverment's
claims and provides additional information to the Court herein.


PROCEDURAL HISTORY

A. RELEVANT HISTORY

    Mr. Valley submitted a Motion to Reduce Sentence Pursuant to
18 U.S.C. §3582(c)(1)(A)(i) on 12/15/20, receivd by this Court on
12/21/20. Mr. Valley asked the Clerk for a copy of the motion to be
mailed back due to his lack of resources due a current COVID-19
outbreak at the facility. After not hearing from the Court, Mr.

Valley sent a follow-up letter to the Court clerk, received by this Court on 1/8/21. (Doc. 126). The Court responded to Mr. Valley on 1/15/21 informing him the motion was before Judge Crabb pending a decission. On 1/20/21, Mr. Valley received a copy of this Court's ruling (Doc. 128) denying Mr. Valley's Motion (re: Doc 120). The next day, Mr. Valley received a copy of the Government's opposing response (Doc. 122) having not been able to respond. On 2/22/2021, Mr. Valley filed a Motion for Reconsideration and attached his Reply (Doc 129). On 4/26/21, this Court vacated it's previous order denying Mr. Valley's Motion for Compassionate Release and Reduction of Sentence and GRANTED him until May 10, 2021 to file a reply. (EXHIBIT 1). (Please note this order was received phyiscally on 4/30/21).

   B. CONTEMPORARY REQUEST FOR LEAVE (IF REQUIRED)

   Mr. Valley does not have the local court rules available to him regarding page limits for replys. If this reply goes over the prescribed page limit, Mr. Valley motions for leave to twenty pages.

## II. ARGUMENT

### A. MR. VALLEY'S MEDICAL CONDITIONS CONSTITUTE EXTRAORDINARY AND COMPELLING REASONS WARRANTING REDUCTION OF SENTENCE

#### 1. GOVERNMENT COMPELS COURT TO DISREGARD MR. VALLEY'S CLAIMS BASED ON AN EVALUATOR'S REPORT NINE YEARS AGO.

   As an initial matter, the Government attempts to coerce this Court to be skeptical and incredulous of Mr. Valley's concerns for his medical conditions, vulnerability to Covid-19 in prison, and the positive changes and reduction of risk warranting his compassinate release. Indeed, the Government says, "anything [Mr. Valley] claims must be viewed with some skepticism." (Doc. 123 @ 8). For the Goverment to suggest this standard of review undermines this Court's

2

promise to Mr. Valley "full consideration of his motion." (Doc. 119).
At the very least; it's unethical.

## 2. MR. VALLEY MEETS THE CRITERIA FOR EXTRAORDINARY AND COMPELLING CIRCUMSTANCES BASED ON AFFIRMED AND KNOWN DIAGNOSIS.

The Government correctly states that Mr. Valley's medical
records reflect his diagnosis of Hypertension and Sinusitis.
(Doc. 122 at 9). The Government concludes that none of these conditions
qualify as high risk groups. (Id.).

The Government assumingly disputes that Mr. Valley has never
had a history of asthma because it's not reflected as a diagnosis.
Mr. Valley has communicated these concerns to health services
multiple times as recent as August 2020. Health Services continues
to provide no updates or continued treatment of Mr. Valley's symptoms
of existing asthma and the breathing problems associated with his
July 2020 contraction of COVID-19. Mr. Valley was promised a
breathing treatment by Samantha May, RN in August 2020, but that has
not occured either.

The Government alleges that even if Mr. Valley did have Asthma,
it is not considered a high risk factor. Courts around the nation
disagree. For example, in United States v. Witherspoon,
no. 16-cr-30041, U.S. Dist. Lexis 92965 (7th Cir.), the Court quotes
information from the CDC:
"People with moderate to severe asthma may be at higher risk of
getting very sick from COVID-19. COVID-19 can affect your respitory
tract (nose, throat, and lungs) causes an asthma attack and possibly
lead to pnemonia and acute respitory disease." See also United States
v. Fettis, no. 17-cr-30003, 2020 U.S. Dist. Lexis 98874. (EXHIBIT 2)

Asthma is undoubtly a high risk factor and concern for those

3

have caught, and are vulnerable to catch COVID-19. Mr. Valley has been diagnosed with Asthma (with asthmatic bronchitis). This diagnosis was established by Dr. Yu, M.D. of Physicians Plus in East Town Madison, WI. In the interests of Justice, this Court could subpoena the medical records to confirm this diagnosis.

Beyond asthma, Mr. Valley also has a hypertension diagnosis. The Government also suggests this is not identified as a high risk factor; but relevant case law is to the contrary. Courts have time and time again ruled that hypertension (high blood pressure) is extraordinary and compelling reasons to grant compassionate release. United States v. Berry, 2020 U.S. Dist. Lexis 123947 (7th Cir.). Multiple courts around the country have written opinions that include this condition as a high risk factor. See United States v. Ford, 2020 U.S. Dist. Lexis 160935, at Footnote 4 (citing multiple cases where hypertension is a risk factor for "extraordinary and compelling reasons for compassionate release").

### 3. MEDICAL RECORD FALLACIOUSNESS

The Court should be cautious when reviewing medical records from the providers at this prison. Multiple inmates who have requested their records have discovered discrepancies and errenous clinical comments. Mr. Valley has had the same experience.

For example, the Government's centerpiece to demonstrates Mr. Valley's unreliable claims was to convey to the Court that he reported using "a bottle of asprin a day to alleviate his lower back pain." (Id.) at P. 9 at Doc 122. This doesn't check out with logic. Absent a desire for kidney failure on NSAID's, it makes no sense Mr. Valley would request this quanity of Asprin.

Mr. Valley complained of multiple symptoms from COVID-19 while

4

in the Quarantine unit. The staff documented none of these symptoms and reported Mr. Valley as "asymptomatic" and discharged him.

This is not an unusual practice. Not only did several inmates who were infected in July and August 2020 receiving boilerplate templatesque comments copied and pasted to each medical record, but in November - January 2020 when another violent wave hit USP Marion infecting over 500 inmates with COVID-19, their medical records reflected almost all the same comments. In fact, many "clinical encoutners" were documented on inmate medical histories without even being seen by a provider. (<u>EXHIBIT 3</u>).

Therefore, it makes Mr. Valley very uncomfortable that he has a health services department that has his best interests at heart and works contrary to the Governments empty assumption that the BOP is taking "appropriate measures to protect the defendant's health." (Doc 122 @ 9).

In Summary, Mr. Valley reports having asthma (although local medical staff have yet to treat) and a confirmed diagnosis in hypertension. Mr. Valley has reported multiple times the consequences attributed to his first contraction of COVID-19 to medical to no avail. In fact, they have not even documented it. These conditions along with the lack of medical care alone constitute "extraordinary and compelling circumstances" to warrant a reduction in sentence under 18 U.S.C. § 3582 and applicable policy.

## B. THE BUREAU OF PRISONS CANNOT PROTECT MR. VALLEY FROM COVID-19.

The Government in their response does not really seem to address this issue. There is one casual unsubstantiated remark (which has since been refuted) that "the BOP has taken appropriate measures to protect the defendan'ts health." However, they provide no proof of

that. In fact, the history of outbreaks and the response from both custody staff and medical are to the contrary.

## 1. HISTORY OF OUTBREAKS AT USP MARION

USP Marion has had at least two deadly outbreaaks, both of which were covered by the local news platforms. In July and August 2020, two seperate inmate deaths were reported, one inmate of which was in Mr. Valley's housing unit. The first outbreak, starting July 2020 resulted in over 150 inmates infected. The second outbreak was worse, resulting in over 500 cases in the building with inmates alone. This is largely in part because staff refuse to wear masks in inmate areas and carry the virus to each housing unit. They do not take the pandemic seriously.

## 2. UNIQUE RISKS TO PRISONERS DURING COVID-19 PANDEMIC

The particularized risk of contracting COVID-19 in a prison setting has been widely accepted. The Government did not respond to this reality and therefore conceeds to the issue. See e.g. Maul v. Constan, 928 F.2d 784, 85-86 (7th Cir. 1991); see also rationale of United States v. Caceres-Olla, 738 F.3d 1051, 1054 n.1 (9th Cir. 2013).

The susceptibility to widepsread outbreaks in an institutional setting is the result of an inability to quarantine or practice social distancing. (Mr. Valley lives in three-man cells, where this is impossible to accomplish). Incarcerated individuals are infected by COVID-19 at a rate of five times higher than the nation's overall rate. The death rate of inmates contracting COVID-19 is approximately 25% higher than the general population. By January of 2021 (the time of Mr. Valley's initial motion), more than 433,000 incarcerated individuals and staff were infected.
(https://eji.org/news/covid-19's-impact-on-people-in-prison#) (2021).

The Government suggests Mr. Valley's request for compassionate release should be denied because "[Mr. Valley] does not indicate any medical care is needed or provide any information showing he would get better care in the community." (Id.) at 9, ECF Doc. 122). As previously discussed Mr. Valley has reported his ongoing and sustained symptoms and not only have they not treated him; they have not even documented his concerns. Any provider outside the BOP would provide better care..

   The Government fails to demonstrate how the Bureau of Prisons can provide a safe - virus free environment for Mr. Valley. The fact Mr. Valley has once contracted COVID-19, refutes this proposal. Mr. Valley urges the Court to recognize the unique risks of his continued presence in the Bureau of Prisons and understand it presents "extraordinary and compelling circumstances" for compassionate release.

### 3. MANAGEMENT OF THE OUTBREAKS AT USP MARION

   Mr. Valley's concerns about the past and imminent outbreaks at USP Marion are not "general concerns" (as the Government claims, p. 9) but real ones that have been substantiated from past experience.

   The conditions at USP Marion during the management of the COVID-19 outbreak were diplorable at best. During the outbreak, staff did not wear masks, eye protection, isolation gowns or other required PPE to reduce or eliminate the spread of the virus. Inmates that were infected were not moved to quarantine, but remained with other non-positive inmates.

   This is not secret information. On November 30, 2020, NPR World News listed USP Marion as the third highest in the nation for COVID-19 outbreaks and cases. A Federal inmate at the USP Marion

facility went public with the Chicago Tribune about the negligence
in the prevention and reaction to the pandemic as well as the
detestable conditions. EXHIBIT 4). An anonymous inmate reports
the same level of incompetence and malpractice Mr. Valley has
experienced, reporting he could not "get out of bed" and "walking
to the bathroom was a huge challenge." When he asked for medical
attention, he was given Tylenol and brushed off. (Id.).

Mr. Hernandez who was an contributor to the article also
reported similar conditions. Mr. Hernandez was in Mr. Valley's
housing unit and therefore witnessed directly the conditions Mr.
Valley was subject to. Mr. Hernandez took detailed reports of the
response from USP Staff and conditions of the unit which was turned
over to the Chicago Tribune. (EXHIBIT 5). Unlike the inmate who
remained anonymous about the conditions at the minimum security
facility in fear of retaliation, Mr. Hernandez identified himself.
Ironically, Mr. Hernandez was placed under "investigation" and
placed in segregation around the time of the article.

There is no doubt that this facility would manage a future
outbreak of the virus carelessly and negligently in the future. To
subject Mr. Valley to this imminent danger in the future is dangerous.
This treatment and lack of care violates Mr. Valley's right to the
Eight Amendment against Cruel and Unusual Punishment - which the
Government did not respond to, and therefore concedes his argument.

Mr. Valley urges the Court to recognize these conditions: lack
of prevention, lack of management during outbreaks, and conditions
that fail to protect him from Covid-19 "extraordinary and compelling
circumstances warranting a reduction in sentence for compassionate
release. To deny Mr. Valley's request, would essentially reward the

BOP's behavior and legitimize their negligent actions.

4. <u>EVEN IF THERE ARE NO CASES AT USP MARION, DOES NOT MITIGATE THE NEED FOR COMPASSIONATE RELEASE.</u>

COVID-19 is still rampant around the nation. It is in no way under control. According to U.S. today and the local news, Illinois and the surrounding areas around Williams County (where USP Marion is located) are heavily saturated with COVID-19 cases. It is not getting any better.

In <u>United States v. Foster</u>, no. 13-cr-324, the Court noted the "unprecedented" circumstances facing "our prison system" with COVID-19 as an extraordinary and compelling basis for release; indeed "[n]o rationale is more compelling or extraordinary." Courts have time and time again noted that "[i]n light of the expectation that the COVID-19 pandemic continue to grow and spread..., the Court conclud[ed] [] the risks faced by the defendant will be minimized by [the inmate's] immediate release home." <u>United States v. Colvin</u>, 2020 WL 1613943 (D.Conn. April 2020). In <u>Rodriguez</u>, 2020 WL 1627331, the Court found that COVID-19 constitutes extraordinary and compelling reasons aassociated with risk factors noting that prisoners are "tinderboxes for infectous disease."

Courts have additionally recognized that just because a facility fails to report cases, does not mean there are no cases. For example, in <u>United States v. Asaro</u>, 2020 WL 1899221, at *3 (E.D.N.Y. 4/20), where there were no cases reported at the facility, the report was "absent more information about how much testing the BOP was conducting, it was possible that undetected cases were present at the facility" and emphasized that "[t]he virus is spreading" in the State where the prison is located.

9

Further, Courts have routinely granted requests for Compassionate release during the COVID-19 pandemic even for inmates at facilities that have never seen COVID-19 cases. United States v. Washington, no. 2:01-cr-258 (E.D. PA. 5/14/20). This took place in United States v. Ktkinson, no. 2:19-cr-55-jcm (CWH), 2020 WL 1904585, **2-4 (D. Nev. 4/2020). Likewise, in United States v. Amarrah, 2020 WL 2220008, an inmate was released that had no reported cases at his facility.

Courts have even concluded that "prison conditions mean incarcerated individuals, as well as society as a whole, are safe when more defendants are released. United States v. Burrill, no. 17-cr-00491-RS-1, 2020 WL 1846788 at *4 (N.D. Cal., 4/10/2020). If Mr. Valley is released, he would be more protected, living in a location where his family takes precautions seriously, professional and responsive medical care would be available, and they would not be a potential factor in the spread of the virus.

Therefore, it is reasonable for this Court to conclude Mr. Valley's need for compassionate release, whether or not there are reported cases and the "extraordinary and compelling circumstances" COVID-19 alone presents to prisons; particularily USP Marion where there has been poor prevention and reaction.

## 5. VARIANTS AND REINFECTION

Several variants of the virus exist today and it is reported by several news networks at the vaccines are not entirely effective. Many of the variants are more contagious and have more severe symptoms. It should not be blindly accepted that the COVID-19 pandemic is under control; rather we as a world population are still trying to understand it and mitigate it.

Of particular importance, reinfection has occured. Judge Myerscough in the seventh circuit opined that the "risk of reinfection is not merely theoretical." United States v. Common, 2020 U.S. Dist. 108555, at Lexis 9 &10 (emphasis added). In this instance, thirteen US sailors aboard the USS Theodore Roosevelt recovered from cornavirus, ensured a rigorous recovery criteria, exceeding CDC guidelines, tested negative, but still caught the disease a second time. (Id.).

It is also of professional medical opinions that when reinfected, it is not associated with less severe symptoms. See www.publichealth.columnbia.edu/public-health-now/news/risk-caronavirus-reinfection-remains-after-recovery.

Therefore, it is very reasonable Mr. Valley have concerns about BOP's ability to protect him, the potential consequences with reinfection and the liklihood of the disease returning to the facility.

6. COVID-19 VACINATIONS AND RECEPTION BY STAFF AND INMATES

Vaccines have commenced at some BOP facilities. The efforts have started with the vaccination of staff first, which is contary to the CDC guidelines which state "to vaccinate staff and incarcerated persons of correctional or detention facilities at the same time because of their shared risk of disease." www.cdc.gov/caronavirus/2019/-ncov/community/corrections). Therefore the most vulnerable majority population remains at risk.

Moreover, even according to the BOP, roughly half of the staff members who have been offered the vaccine has declined. This is because they don't take inmate health and safety seriously. www.bop.gov/resources/news/20210116_covid_vaccine_efforts).

Even with these vaccines, the general population in America has reported 6,000 infections having been infected despite vaccination.

11

Source: USA Today, Nation+Health, April 16, 2021.  29% were asymptomatic.

Therefore, the employment of vaccinations (coupled with the amount of staff and inmates declining) does not alleviate the problems associated with the virus in the prison. This will continue to imperil vulnerable inmates like Mr. Valley into the foreseable future.

Section Conclusion: Mr. Valley has two conditions: hypertension and asthma, - which puts him at higher risk of Covid-19. The Medical staff at USP Marion are careless and non-responsive, and provide inaccurate documentation of patient files. The Bureau of Prisons has demonstrated that they cannot prevent COVID-19 from coming into USP Marion. When it does, they treat inmates poorly, disregard isolation and infectous disease procedures and are negligent. Courts from around the Country have found Covid-19 and the unprecedented dangers facing the prison system are "extraordinary and compelling basis for release. (Foster, supra.). Regardless of the reported counts of cases at any given time, cases may very well be present, and does not demonstrate a facility is safe from the virus. Vaccinations are slowly being distributed but staff and inmates are declining for various reasons and the multiple strands are causing problems around the nation; some of which the vaccine is ineffective. For the foregoing reasons, Mr. Valley urges this Court to find merits on Mr. Valley's extraordinary and compelling circumstances to grant compassionate release.

## C. MR. VALLEY'S TIME SERVED ACCOMPLISHES THE GOAL OF SENTENCING PURSUANT TO §3553(A) FACTORS

Extraordinary and Compelling circumstances exist in this case. Once the Court establishes those merits, 18 U.S.C. § 3582(c)(2) requires the Court to consider the factors set fourth in §3553(a).

This statute provides:

> The Court shall impose a sentence sufficient but not greater than necessary to comply with the purposes set forth in paragraph 2 of this subsection. The Court in determining the particular sentence to be imposed shall consider -
>
> 1) The nature and circumstance of the offense and the history and characteristics of the defendant.
>
> 2) the need for the sentence imposed -
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law.
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner.

## 1. SENTENCING GUIDELINES

Mr. Valley does not contest the Presentencing Report's calculation of the Guideline range. However, like many federal courts addressing the issue of excessively long sentences for child pornography. Mr. Valley submits the guidelines are disproportionate.

Numerous Federal Courts have noted that, while child pornography is unquestionably serious, the sentencing ranges suggested by the Federal Sentencing Guidelines were disproportionate to the offense. See e.g., United States v. Riley, 665 F.Supp.2d 1298, 1304 (S.D.Fla. 2009) ("numberous district courts have imposed sentences far below the guidelines range for offenses involving the possession and transportation of child pornography") (collecting cases). For examle, United States v. Baird, 580 F.Supp.2d 889 (D.Neb.2008), Mr. Baird received twenty four months, over 800 images of child pornography were discovered, but it was established he had low criminal history and two psychologists said he was at low risk of reoffending. See also, United States v. Kelly, 868 F.Supp.2d 1202, 1211 (D.N.M.2012) (defendant downloaded 580 images of child pornography; "[Defendant's] advisory guideline sentence of 87 to 108 months imprisonment is

13

far greater than necessary to punish and deter his conduct and
protect the public. This is largely due to the serious flaws in U.S.S.G.
§ 2G2.2, which was not drafted pursuant to the sentencing commission's
usual expertise, and all too frequently generates unjustly excessive
terms of incarceration." In United States v. Starl, No. 10-cr-270,
2011 WL 555437 at *7 (D.Neb. 2011) defendant downloaded over 100
images, had multiple hardrives of over 2000 images, 5000 videos,
and 650,000 images of child erotica. The Court said, "[T]he child
pornography guidelines are driven by Congressional directive and are
not grounded in any scientific, statistical or emperical method."
Lastly, in United States v. Cruikshank, 667 F.Supp.2d 697, 702
(S.D.W.Va.2009) the Court concluded guidelines recommend higher
sentences toward child pornography offenses than those of child rape.
Therefore, Mr. Valley urges this Court to consider the §3553(a)
factors as more relavent in this instant case.

## 2. FACTORS IN 18 U.S.C. §3553(a) COMPEL A SENTENCE OF NO MORE THAN 10 YEARS.

In holding that the United States Sentencing Guidelines are
advisory, not binding, the United States Supreme Court noted that
the sentencing Court has "has 'greater familiarity with the individual
case and the individual defendant before them than the Commission or
Appeals court.'" Kimbrough v. United States, 552 U.S. 85, 109,
128 S.Ct 558, 574 (2007). This is why the factors in §3553(a) are
so important.

Following the instructions under Pepper v. United States, this
Court should consider "the most up-to-date picture" of the defendant's
history and characteristics, which "sheds light on the liklihood
that [the defendant] will engage in future criminal conduct."
562. U.S. 476, 492 (2011). (emphasis added).

14

## (A). NATURE OF OFFENSE AND CHARACTERISTICS OF DEFENDANT
### (1) NATURE OF THE OFFENSE

Mr. Valley pled guilty to two counts of information, admitting to violating 18 U.S.C. §2252(a)(2). Mr. Valley admitted to knowingly receiving a picture, sexually explicit in nature of "Minor B" and "Minor C." Mr. Valley admitted to contacting girls using a cellular phone and requesting such depictions, and the girls complied with his request sending child pornography images. The girls in this case sixteen and fifteen years of age.

### (2) NATURE OF THE DEFENDANT

When this Court met Mr. Valley, he was a man who had suffered a very traumatized childhood and adolescence. In fact, clinically, Mr. Valley was still an adolescent at age twenty six (having many childlike qualities, inability to maintain a job or provide a home for himself). This was the product of witnessing his grandfathers body after suicide at age nine. It resulted in self mutilation and other destructive behaviors which resulted in intervention including being institutionalized - restraints, forced medication, outbursts, the works, all between eleven and fifteen years old.

Mr. Valley received a myriad of medications, and diagnosis: Bi-Polar, Psych.-Deficient disorder, Schizo Affective Disorder. Having tried high school and failing, he contemplated his self-hate which led to suicidal ideations. He was socially awkward. He didn't fit in with anyone, and therefore; created his own alter-egos.

After his arrest, his thoughts of self hate, mixed with fear returned and he tried to maintain the alter-egos he created for himself. He was lost, alone, and had no direction.

The Court resolved that Mr. Valley was a "conniving,

15

manipulative, self-absorbed young man," "had no concern for [his] girlfriend..." or "[his] mother" while living in his fantasy world. (R. 105, p. 20-21). Mr. Valley does not dispute this. He understands the behavior he demonstrated to the Court and why Judge Crabb was concerned for    "all the girls out there and potential victims of [his]." (Id.) at 22. As Judge Crabb said, "this is a very difficult case" and she feared Mr. Valley would "not get better in prison." (Id.) at 20, 22. Mr. Valley realizes the Court had to use the information it had to render a sentence that would protect the public, even though it was a very long imprisonment sentence.

The benefit of the Court today is that there is a new, up-to-date Thomas Valley. He has been in prison now for ten years. And since his sentencing, the words of the Court and prosecutor has never left his mind. He has come to realize how distorted his behavior was. He doesn't want to be a manipulative, conniving, self absorbed man. He wants to be known as a generous, loyal and honest person. The road to this transformation has been slow, but it has evolved noticeably over the last seven years.

Mr. Valley has made serious gains since 2013. Having only completed education up to the eleventh grade, he now earned his G.E.D. Mr. Valley has participated in psychology encounters and self help programs available at the prison. One of the most notable differences was subscribing to a world view and moral standard that he can commit to. Mr. Valley has joined the Orthodox Jewish Faith, and regularily participates in services, ceremonies and studies. This change in beliefs has impacted not only how he interacts with other people, but he can accept who he is as a person.

Mr. Valley has taken a myriad of Adult Continuing Education

classes, making himself prepared for the job market. He participated at UNICOR - working an honest job and learning job skills.

Mr. Valley's conduct as an inmate is almost completely clear. He is not known as a disruptive trouble maker and does what he can for other people that are less fortunate than him. Mr. Valley takes pride in being caring, responsible, and respectful to individuals.

One of the biggest things that have changed his perspective about his past conduct and behavior is the limited interactions he has had with his nine-year-old daughter over the years. He would never want anyone interacting with his daughter the way he did with others and has given him significant insight. He has come to realize the honor and responsibility that comes with being a father and the type of partner he should have been for his girlfriend ten years ago.

Although the Government may have been able to say Mr. Valley posed a danger to the community at sentencing; the same can not be said today. Mr. Valley is older, wiser, and more mature and this experience has taught him a valuable lesson in the value of women; but also himself.

(3) <u>REFLECTING SERIOUSNESS OF OFFENSE, PROMOTE RESPECT FOR THE LAW</u>

Ten years per count, running concurrent, or five years per count running consecutive (10 years total) is a serious prison term. This sentence more than shocks the conscience and encourages lawful conduct by Mr. Valley. The Government doesn't challenge this. (Doc. 120, p. 10).

(4) <u>AFFORD ADEQUATE DETERRANCE TO CRIMINAL CONDUCT</u>

In subsection 3553(a)(2), Congress addressed the "need for the sentence imposed" from both a general and "specific deterrence" standpoint. The government does not challenge this position.

From a general deterrence standpoint, ten years imprisonment accomplishes this purpose. It would easily serve to discourage those

who, like Mr. Valley, contacted girls online under a false persona, to send nude pictures of themselves for personal consumption. It's simply not worth it.

From a specific deterrence standpoint, Mr. Valley's actual arrest, prosecution and prison experience is all the deterrence he needs; a prison sentence longer than ten years will have only marginal impact (if any) with respect to deterrence. This Court agreed with that (R. 120 p. 22). Mr. Valley already recognizes the wrongfullness of his actions and has developed tools to prevent it from happening in the future.

From a personal stand point, Mr. Valley wants to continue attending Jewish practices on the street. Mr. Valley wants to be reconciled with his family and two children. There are too many losses associated with the prosecution and imprisonment for violating any more laws.

## (5) PROTECT THE PUBLIC FROM FURTHER CRIMES OF MR. VALLEY

This seems to be the only argument the Government presents. The Government recounts behavior that Mr. Valley exhibited over ten years ago. (Doc 122, pp. 10-11). Mr. Valley does not disagree that his behavior was deviant, distorted and predatory. However, Mr. Valley is not the same person today that he was back then. For the Government to say he is the same person today; is unsupported.

Mr. Valley realizes the position he put the Court in almost eight years ago. The Court had in mind, the obligation to protect the women of the community from his behavior. He had no way to demonstrate that he could improve. The same cannot be said today. Mr. Valley has participated in several self help and institution programs to equip him to identify triggers and risk relevant

behaviors that would lead him down that road.

The United States Probation Department has a wonderful program in place to monitor Mr. Valley's actions. GPS Ankle Monitoring; Online Activity Monitoring; Treatment; Counseling; Polygraphs. Mr. Valley would have supervision and accountability. The risk to the public is very little; if any. A period of Home Detention is amenable to Mr. Valley for a good transition to the community.

### (6) PROVIDING MR. VALLEY WITH EDUCATIONAL/VOCATIONAL AND MEDICAL CARE IN MOST EFFECTIVE MANNER

There is no educational or vocational programming that is available during this time. When there was, Mr. Valley took advantage of it.

As previously discussed, the medical staff here are not responsive to his needs, uses boilerplate clinical notes and does not document patient concerns.

### (7) CONCLUSION OF §3553(a) CONSIDERATIONS:

Mr. Valley realizes the seriousness of the offense and understands why the federal laws are severe and strict about protecting our vulnerable population: children. The arrest, prosecution and prison experience provides all the deterrence he needs to not allow this behavior to repeat itself. Mr. Valley has curved his desires from young women to wanting to be father to his children, a gainfully employed citizen, and a good neighbor. Mr. Valley has identified the relevant triggers in his life and has new moral and spiritual convictions. He has matured a lot through this experience and has many new goals he wants to accomplish as a contributing member of society.

A sentence of time served would serve the purposes of §3553(a).

19

At the very least; Mr. Valley asks the Court not to run the terms of imprisonment consecutive.

### (8) MR. VALLEY HAS A PLACE TO SELF ISOLATE

Mr. Valley can reside at 339 S. Main St. Cottage Grove, WI 53527. This is his Aunt and Uncles house. He would be able to quarantine upon his possible return, and practice "social distancing." Mr. Valley would secure employment and start treatments as directed by his probation officer.

### CONCLUSION

For all the above reasons, Mr. Valley requests his Motion to Reduce Sentence be granted.

Respectfully Submitted,

Thomas R. Valley, Pro-Se

Date: 4-6-21